Theodore W. OSWALD, Petitioner,

v.

Daniel BERTRAND, Respondent.

No. 01–C–0182.

United States District Court,
E.D. Wisconsin.

March 26, 2003.

Jerome Butting, Kathleen Stilling, Brookfield, WI, for Petitioner.

Warren Weinstein, Madison, WI, for Respondent.

### DECISION AND ORDER

ADELMAN, District Judge.

Theodore W. Oswald, a Wisconsin state prisoner, petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his conviction of nineteen offenses in Waukesha County Circuit Court in 1995, for which he was sentenced to 565 years in prison consecutive to two life sentences (in addition to ten years to be served concurrently).

Petitioner was charged with and convicted of three counts of party to the crime of aiding and abetting an armed robbery while concealing identity; one count of party to a conspiracy to commit first-degree intentional homicide by using a bulletproof vest and a dangerous weapon plus one count of an attempt of the same crime; one count of party to the crime of aiding and abetting the armed taking of a vehicle without consent using a bulletproof vest; one count of party to the crime of aiding and abetting armed burglary using a bulletproof vest; one count of party to the crime of aiding and abetting the armed taking of hostages by force or threat using a bulletproof vest; one count of party to the crime of aiding and abetting the armed operation of a motor vehicle without consent using a bulletproof vest; eight counts of party to the crime of aiding and abet-

ting attempted first-degree intentional homicide using a bulletproof vest and a dangerous weapon; one count of party to the crime of aiding and abetting first-degree recklessly endangering safety using a bulletproof vest and a dangerous weapon. *State v. Theodore Oswald,* 232 Wis.2d 62, 67 n. 2, 606 N.W.2d 207 (Ct.App.1999).

Petitioner unsuccessfully sought post-conviction relief in the trial court and then appealed to the state court of appeals. The court of appeals did not immediately decide the case but rather certified it to the state supreme court. However, the state supreme court refused to accept certification and returned the case to the court of appeals. The court of appeals then affirmed the conviction; and the state supreme court denied petitioner's request for review.

In his habeas petition, petitioner claims that: (1) his constitutional rights to due process and an impartial jury were denied because the trial court failed to adequately inquire into questions concerning juror bias that arose during jury selection; (2) his constitutional rights to due process and an impartial jury were denied because a biased juror served on the jury; (3) his constitutional rights to due process and an impartial jury were denied because the state courts arbitrarily deprived him of statutory rights relating to jury selection; and (4) his right to effective assistance of counsel was denied as the result of his trial counsel's inadequate handling of a possible insanity defense.

## I. FACTS

### A. Background Facts

Petitioner, who was eighteen years old at the time, robbed a bank with his father, James H. Oswald, in Wales, Wisconsin on the morning of April 28, 1994. They fled and traveled toward Waukesha. Two City of Waukesha police officers stopped the Oswald vehicle, at which point the Os-

walds, armed with semi-automatic rifles, got out of the vehicle and shot at the officers, killing one. A chase ensued during which the Oswalds forced their way into a private residence, took a woman hostage and forced her to drive them away in her vehicle. The chase ended in a shootout between the Oswalds and numerous police officers in which two officers and the hostage sustained gunshot wounds. By the time of the shootout, the local media had learned of the incident, and the shootout, the escape of the hostage and the crash of the getaway vehicle were filmed live and rebroadcast extensively. *State v. James H. Oswald,* 232 Wis.2d 103, 109, 606 N.W.2d 238 (Ct.App.1999).

The case generated an enormous amount of publicity both in the immediate aftermath of the crime and during the period leading up to the trials of the Oswalds. The serious nature of the offenses, the fact that a local police officer was killed, the existence of the highly unusual videotape (with its echoes of the O.J. Simpson case) and the fact that the defendants were father and son combined to make the case probably the most notorious in the history of Waukesha County.

Petitioner was tried separately from his father. Petitioner's trial commenced on February 13, 1995, about ten-and-a-half months after the offenses were committed. His defense was that his father coerced his participation in the offenses. Under Wisconsin law, coercion is a complete defense to any criminal charge except first-degree intentional homicide, in which case it reduces the offense to second-degree intentional homicide. Wis. Stat. § 939.46(1). Petitioner did not request a change of venue, theorizing that because some of the publicity had portrayed him as a victim of his abusive and manipulative father, a local jury might be more receptive to his defense than a jury elsewhere.

Questionnaires were sent to 156 jurors. More than eighty percent responded that, based on media coverage of the events, they believed that petitioner was guilty. The effect of the publicity was reflected in some of their comments. Six jurors suggested a trial would be a waste of taxpayers' time and money. Five expressed concern about their personal security because the offenses occurred so close to home. Nine said petitioner should have either died in the crash or should receive the death penalty if it were available.

In the months before trial, the widow of the police officer who was killed initiated a highly-publicized petition drive to have the death penalty reinstated in Wisconsin. About a month before the trial began, she submitted a petition with 4,000 signatures to the legislature. One of the jurors indicated that she had signed the petition.

Of the more than 150 jurors summoned to the voir dire, fifty were questioned. The plan was to obtain a pool of twenty-nine from which peremptory challenges would be exercised so that there would be three alternate jurors; and each party would have seven peremptory strikes.

I will state the remaining facts by categorizing them according to the claim to which they relate, although some facts relate to more than one claim.

**B. Facts Relating to Claim That Trial Court Failed to Adequately Inquire Into Questions Concerning Juror Bias That Arose During Jury Selection**

Jurors gathered in a jury assembly room in the courthouse. From the jury assembly room, a bailiff escorted them to the courtroom where the court and counsel questioned each individually. On several occasions, the court instructed jurors not to discuss the case among themselves.

Late in the morning of the fourth day of jury selection, juror Roger Klitzka told the court and counsel that he did not know much about the case before coming to court, but that he had learned much from other jurors. He stated that:

I know I've learned more in the last three days here sitting down in that room about this case than I have since the day that it happened . . . . according to what I hear, the young man is guilty of what he is being accused of and things like that and everything and I think it's just a waste of time.

(App. to Pet'r's Mem., hereinafter "App.," at 507–08.)

Klitzka also said that as the result of the information he had received from other jurors, he concluded that the trial would be a waste of time. This is reflected in the following colloquy with the court:

Q. That it's a waste of time to have the trial at all?

A. Yes.

Q. The—you understand that an individual who is charged with crimes or criminal activity is entitled and has a right to have a trial and to require the state prove that he committed whatever he's charged with?

A. Yes. I understand it, but I was just giving you my opinion on it.

(*Id.* at 508.)

Neither the court nor the prosecutor asked Klitzka any follow-up questions about his disclosure that jurors were talking about the case in the jury assembly room. After the court completed its questioning of Klitzka, the prosecutor asked him whether he could keep an open mind; and Klitzka responded that everything that he heard was hearsay and that "if you can come up with actual evidence and things like that, yes sir." (*Id.* at 516.)

Petitioner's counsel then attempted to follow up on Klitzka's statement about conversations in the jury assembly room, stating: "I'm somewhat concerned that you've

heard a lot about this case in the last 3 days and ... I'm wondering if you could tell us specifically what types of things you've heard about the case"? Klitzka responded: "No, I won't tell you that." (*Id.* at 519.) Petitioner's counsel then asked for a sidebar at which he stated:

Judge, I'm very concerned Mr. Klitzka told us that he's obtained almost all of his information on this case in the last 3 days and he refused to answer my inquiry on that issue.... If he's been getting his information in the past 3 days, first of all, he's in violation of—of the court's order not to discuss it .... Now, if it was inadvertent or minimal I suppose that could be understandable and excusable, but to have no opinion before Monday that I'm aware of and then to form a strong opinion that he's—that Mr. Oswald is guilty based on what he's heard in the last 3 days is very troubling to me so I would ask the court to call Mr. Klitzka back and I would ask the court to inquire specifically concerning these matters and inform Mr. Klitzka that he's required to provide this information.

(*Id.* at 521–22.)

The prosecutor objected arguing that the question would intrude "into his [Klitzka's] privacy" and involved a matter that was "none of his [petitioner's counsel's] business." (*Id.* at 523–25.) Petitioner's counsel responded that:

[t]he clear implication is that he received it [information] from other jurors, other potential jurors, which is very troubling because that means that there's more than one that's not been following the court's order .... He's not willing to reveal what his information is. It's impossible for me to probe for bias in a meaningful way. He has simply shut down on giving out information ....

(*Id.* at 525–26.)

The court upheld the prosecutor's objection and declined to require Klitzka to answer additional questions about the communications in the jury assembly room. It also declined petitioner's request to strike Klitzka for cause.

Petitioner's counsel then asked the court to inquire of the other jurors about what they might have heard in the jury assembly room, stating:

I think it's necessary that an inquiry be conducted of the other juror members whether the case has been discussed. I'm very concerned that information is now being spread to the jurors in this case from some source apparently within their own numbers about opinions on this case concerning guilt or innocence and I think there's enough evidence at this point in the record to suggest that's taking place and of course that taints the entire jury process, and I think it's incumbent upon the court to investigate that matter and the—in the way it determines to be appropriate. I don't think we can ignore Mr. Klitzka's claims.

(*Id.* at 531.)

The prosecutor objected to questioning any of the approximately twenty-five jurors who had already been qualified to be in the pool of twenty-nine:

Whether or not any of the jurors have discussed the facts of this case, what do we expect these individuals to do? I mean, this is crazy to have these individuals come in here for 4 days and sit for 4 days in a crowded jury room downstairs on a—on a case that everybody other than one juror that we have talked about has seen a videotape concerning probably the highest profiled case in this county in 20 years and not to even think or mention the case or mention how disgusted they are with the process.

(*Id.* at 532.)

Petitioner's counsel then suggested that, if the court first questioned Klitzka in

greater detail, it might learn whether it was necessary to question other jurors. However, the court denied petitioner's counsel's requests to question Klitzka and/or any jurors who had already undergone voir dire about the statements in the jury assembly room, but said that it would permit him to inquire about the matter with the few jurors who remained to be questioned.

The next juror to be questioned was Susan Beers. Petitioner's counsel asked her whether jurors were talking about the case in the jury assembly room, and the following colloquy ensued:

A. Well, people have their opinions
. . . .

Q. People in the courthouse or other jurors?

A. Well, other jurors.

Q. Have other jurors either expressed to you opinions or tried to convince you about anything?

A. No, no. Not tried to convince but they had their opinions and, you know, but umm, you know, you don't know how serious they are about what they're saying either.

Q. Like what type of things have you heard?

A. Umm, well, I don't know how to say—well, they will just say it's guilty, you know, right off the top of their head.

(*Id.* at 412.) Beers stated that jurors had expressed this opinion "all during the 4 days," but that she had not been influenced by them. (*Id.* at 413.)

The prosecutor then stated:
Judge, I think we need to act on that immediately even though we have only one juror left we may have to deal with this in a much more deeper fashion, ... the sooner the better that they are [told] not to talk, expose themselves to other jurors, elicit opinions or even remotely consider anything having to do with this case. I'm not sure how you can make it any more encompassing than that. Maybe we failed to do that. I didn't think we needed to. . . . hopefully there's been no harm done.

(*Id.* at 417.)

Petitioner's counsel reiterated his concern that jurors who had already been qualified to be in the pool of twenty-nine might have made or been biased by the improper communications and again requested that the court question Klitzka and/or the jurors to determine if the pool included biased jurors. However, the prosecutor objected, and the court denied the request. The court granted the prosecutor's request that it go to the jury assembly room during the noon recess and re-instruct jurors not to discuss the case.

The court and counsel then questioned Robert Leonard and Eleanora Jorgenson, the last jurors to be questioned, and neither reported having heard other jurors express opinions about the case.

During the noon recess, the judge went to the jury assembly room and re-instructed jurors not to talk about the case. In the jury assembly room, juror William Schuenke said to the judge: "I really want to talk to you. I had written that letter. It's really important. I don't want to—I'm part of the 29." (*Id.* at 314.)

After the recess, the court and counsel reconvened in the courtroom. At petitioner's counsel's request, the court heard testimony from Addison Steady, one of the bailiffs responsible for the jurors. He testified that he had not heard jurors talking about the facts of the case but said that he was present only on the third and fourth days of voir dire and was in the jury assembly room only when he was not escorting jurors to and from the courtroom.

The court then indicated that four jurors had written notes asking to be excused.

In discussing how to handle the requests, the court advised counsel of Schuenke's statement in the jury assembly room, stating that Schuenke "was in the back of the room, there was very little question the comment was heard by everybody else that was in the room as I was in the front of the room." (*Id.* at 317.)

The prosecutor asked the court to deny the jurors' requests to be excused. However, based on the content of his request, petitioner's counsel asked the court to remove Schuenke for cause or, alternatively, to permit further questioning of him. Petitioner's counsel pointed out that in his letter Schuenke wrote: "I will more than likely be so concerned about my work that I'd not give the trial all the attention it should receive to the point that I might just vote either way just to end it." (*Id.* at 322.) Petitioner's counsel argued that Schuenke's letter showed that he was

a juror that's basically saying they can't take their responsibility seriously. I mean if ... they can't fulfill their duty despite the instructions and ... they're not going to vote their conscience and listen to the evidence and deliberate according to law, obviously ... some further inquiry or record [is required].

(*Id.*)

Petitioner's counsel added that without questioning Schuenke further, he had no way of knowing whether Schuenke would be a conscientious juror, and that he could not meaningfully determine whether to use one of his peremptory strikes to remove him. Petitioner's counsel noted that the court had already denied seven of his challenges for cause, and that he had planned to use his seven peremptories to strike the jurors who he had unsuccessfully challenged, and that, if he did, he would have no strike to exercise on Schuenke, a juror who said that he might not decide the case on the evidence.

The prosecutor responded that he shared some of petitioner's concerns but feared that further questioning might lead to the loss of jurors. However, he said that he would leave the matter up to the court. The court then declined to remove Schuenke for cause or to permit further questioning of him about the letter.

The court also addressed a letter from juror George Schroeder, who had said on voir dire that he could set his opinion aside and consider the evidence, but stated in his letter that he now believed that petitioner was guilty, and that he could not be unbiased. The court agreed to further questioning of Schroeder but declined petitioner's request to inquire whether communications from other jurors caused Schroeder to change his mind.

The court returned the twenty-nine jurors comprising the pool to the courtroom and advised them that the requests to be excused had been considered. At this point, Schuenke said to the judge: "I asked to speak to you 2 days ago. You mean I can't get five minutes of your time?" (Answer to Pet. Ex. B2 at 216–17.) The court again advised Schuenke that the requests had been addressed. Schuenke replied: "Not to me they weren't you know." (*Id.* at 217.)

## C. Facts Relating to Claim That A Juror Was Biased and Committed Misconduct

In his questionnaire, Schuenke stated that it would be hard for him to believe that petitioner was not involved in the offense. On voir dire, in response to the court's questions, he said that he meant by this that it would be hard for him to believe that petitioner was not there. In answer to one question from the prosecu-. tor, he said that he would try to follow the court's instructions and decide the case on the evidence, and, in answer to another, that he would do so. In answer to peti-

tioner's counsel's questions, he testified that he had an open mind about the charges and about defenses that petitioner might offer, and that he had not formed any opinions about any participants in the case. Petitioner did not exercise a peremptory strike to remove Schuenke, and Schuenke served on the jury.

The question of whether Schuenke was biased and committed misconduct was the subject of a post-conviction motion and hearing. Petitioner presented an affidavit and testimony from Jacqueline Mihm, a juror who had been excused. Mihm was a fifty-two-year-old college graduate, married and the mother of three, and a substitute teacher in the Wauwatosa School District for ten years.

Mihm testified that during all four days of jury selection, two or three men were making comments to other jurors that petitioner was guilty and that the trial was a waste of time. She stated that the men complained that too much money was being spent on the trial and that "the county could better spend it on something else," and that "this [participating in the trial] was a waste of everybody's time." (App. at 625.) She testified that one of the men making the comments that petitioner was guilty and the trial was a waste stood out in her memory because of his "definitely not wanting to be on the jury" (*id.* at 626), and because he was "the man who spoke up to the judge" (*id.* at 602). She further testified, however, that "when the final tally was taken . . . he didn't get his wish" and "was on the jury." (*Id.* at 626.) In this way, Mihm identified Schuenke as one of the men making the improper statements in the jury assembly room.

On cross-examination, the prosecutor asked Mihm about her answers to several questions on the jury questionnaire. In her questionnaire, Mihm disclosed that she had called the police regarding "domestic problems," but answered "no" to questions asking whether she had been involved in an assaultive relationship, experienced spousal abuse, been a victim of a crime involving physical violence, and had physical or emotional problems that might interfere with jury service. (*Id.*) At the hearing, she testified that, prior to receiving the questionnaire, she had been physically assaulted by her husband, that police had been called to her home to remove her son, and that she had had some emotional problems but did not believe they were sufficiently serious to prevent her from being a competent juror.

At the close of the hearing, petitioner moved for a new trial arguing that Schuenke's statements in the jury assembly room showed that he was biased and that he had not honestly answered the voir dire questions. The court rejected Mihm's testimony and denied the motion.

**D. Facts Relating to Claim That State Courts Arbitrarily Deprived Petitioner of Statutory Rights Relating to Jury Selection**

Petitioner claims that he was denied due process and the right to an impartial jury because the state courts arbitrarily deprived him of rights granted to him by state statutes in connection with jury selection. At the root of petitioner's claim is his assertion that the trial court unlawfully refused to remove three jurors, Jan Goldberg, Marcia Weidler and Edward Tonn, for cause. When the trial court refused to remove these jurors, petitioner used three of his statutory allotment of seven peremptory strikes to remove them. He contends that as a result of losing these strikes, he suffered substantial harm and that, therefore, the state court of appeals was required to grant him a new trial. The voir dire testimony of Goldberg, Weidler and Tonn is relevant to this claim. However, because I quote from this testimony at length later in the decision, I will not reproduce it here.

## II. STANDARDS OF REVIEW

A federal court may grant federal habeas relief to a state prisoner who is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. §§ 2241(c)(3) and 2254(a). Because the habeas petition in this case was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the standard of review contained in that Act governs petitioner's claims. *Ouska v. Cahill–Masching,* 246 F.3d 1036, 1044 (7th Cir.2001). As amended by AEDPA, the federal habeas statute allows federal courts to grant habeas relief if the state court decision under review (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

However, the standards provided in § 2254(d)(1) and (2) only apply to a "claim that was adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d); *accord Braun v. Powell,* 227 F.3d 908, 916 (7th Cir.2000). As courts have recognized, a state court decision cannot be viewed as an "'adjudication on the merits'" if the state court failed to resolve all determinative issues of federal law, either because they were not before the state court or because the state court's framing or analysis of the claim omitted one or more dimensions of the requisite federal constitutional analysis. Randy Hertz & James Liebman, *Federal Habeas Corpus Practice and Procedure* § 32.2 (4th ed.2001) (quoting 28 U.S.C. § 2254); *see, e.g., Norde v. Keane,* 294 F.3d 401, 410 (2d Cir.2002) (because state court "never indicated in any way that it had considered [petition-er's] Sixth Amendment claims," the "claims were not adjudicated on the merits, and therefore ... AEDPA's new, more deferential standard of review does not apply"); *Everett v. Beard,* 290 F.3d 500, 507–08 (3d Cir.2002) (holding that § 2254(d)(1) did not apply because state courts had analyzed claim solely under state law and did not address underlying due process issue: "[t]he AEDPA standard of review does not apply unless it is clear from the face of the state court decision that the merits of petitioner's constitutional claims were examined in light of federal law as established by the Supreme Court of the United States"); *Lockhart v. Johnson,* 104 F.3d 54, 57–58 (5th Cir.1997) ("AEDPA's provision altering our standard of review, when the petitioner's claim has been adjudicated on the merits by a state court, has no application to this claim" because it "was not presented to the state court and the Director has waived the exhaustion requirement").

Where a claim has not been adjudicated on the merits by the state court, federal courts reviewing habeas petitions must apply the general standard as set forth in 28 U.S.C. § 2243. *Braun,* 227 F.3d at 917. This standard requires courts to "dispose of the matter as law and justice require." 28 U.S.C. § 2243.

Section 2254(d)(2)'s provision authorizing habeas corpus relief when the state court's determination of the facts "is unreasonable ... in light of the evidence presented in the state court proceeding" appears to be contradicted by § 2254(e)(1)'s attachment of a strong presumption of correctness to apparently any "determination of a factual issue made by a State court."

The two provisions must be read *in pari materia,* however. Doing so leads to the conclusion that § 2254(d)(2) divides "determination[s] of the facts" into two categories—state court factfindings that

are flawed because they are "unreasonable," hence are a basis for habeas corpus relief without more; and findings that are not flawed because they are "[ ]reasonable," hence are presumed to be correct unless the petitioner proves otherwise "by clear and convincing evidence." In other words, the "determination[s] of a factual issue made by a state court" that § 2254(e)(1) tells courts to "presume[ ] to be correct" are only those determinations that survive § 2254(d)(2)'s winnowing out of "*unreasonable* determination[s]."

Hertz & Liebman, *supra,* § 20.2(c) (alteration in original) (quoting 28 U.S.C. § 2254); *see, e.g., Avila v. Galaza,* 297 F.3d 911, 918 (9th Cir.2002) (because "several of the [state court] referees factual findings are clearly erroneous, state court's decision must be deemed 'unreasonable determination of the facts'" under § 2254(d)(2)); *Davis v. Strack,* 270 F.3d 111, 133 (2d Cir.2001) ("case ... fits comfortably under subsection (2) of § 2254(d)" because state courts' "determination of facts" regarding adequacy of evidentiary basis for self-defense instructions were "without reasonable basis"); *Green v. White,* 232 F.3d 671, 672, 678 (9th Cir. 2000) (state courts' findings that venireperson "did not lie about his past criminal history" and was "not biased" were "clearly erroneous" "factual determinations" and therefore state courts' decisions were based upon "unreasonable determinations of the facts").

## III. DISCUSSION

### A. Claim That Petitioner Was Denied Due Process and Right to an Impartial Jury When Trial Court Failed to Adequately Inquire into Questions Concerning Juror Bias That Arose During Jury Selection

Petitioner claims that he was denied due process and the right to an impartial jury because the trial court failed to adequately inquire into questions concerning juror bias that arose during jury selection. The state court of appeals addressed the adequacy of the voir dire under state law but did not address the federal due process questions raised by the court's handling of the jury selection process. *Theodore Oswald,* 232 Wis.2d at 85–86, 606 N.W.2d 207. Respondent's view is that "[t]he Wisconsin Court of Appeals did not read Oswald's state appeal to raise a *Groppi v. Wisconsin* type.claim" (Resp't's Br. at 10), i.e., a claim "that he was unconstitutionally deprived of the opportunity to take reasonable steps designed to insure that the jury was impartial, *Groppi v. Wisconsin,* 400 U.S. 505, 91 S.Ct. 490, 27 L.Ed.2d 571 (1971)" (Resp't's Br. at 4). However, respondent "does not oppose this court addressing Oswald's claim that the trial court failed to fully investigate his bias/misconduct on the merits." (*Id.* at 10–11.)

Thus, I turn to the merits of petitioner's claim. However, as previously discussed, because the state court of appeals did not address the due process issue, it did not adjudicate petitioner's federal due process claim "on the merits" under § 2254(d). Therefore, I do not employ the standard of review provided in § 2254(d)(1), but rely on the general standard as set forth in 28 U.S.C. § 2243. *Braun,* 227 F.3d at 917 (citing *Moore v. Parke,* 148 F.3d 705, 708 (7th Cir.1998)). I note, however, that I would reach the same result under either standard.

### 1. Applicable Law

 The United States Constitution guarantees a criminal defendant the right to an impartial jury. U.S. Const. amend. VI. The Fourteenth Amendment guarantees a right to a jury trial in all state criminal cases which, if tried in a federal

court, would come within the Sixth Amendment's guarantee of trial by jury. *Duncan v. Louisiana,* 391 U.S. 145, 149, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). Prior to *Duncan,* the Supreme Court recognized in *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), and in *Turner v. Louisiana,* 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965), that the Fourteenth Amendment's Due Process Clause independently requires the impartiality of any jury empaneled to try a case. *Morgan v. Illinois,* 504 U.S. 719, 726, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). •

> In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, "indifferent" jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. *In re Oliver,* 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948); *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 [ (1927) ). "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955). In the ultimate analysis, only the jury can strip a man of his liberty or his life. In the language of Lord Coke, a juror must be as "indifferent as he stands unsworn." *Co. Litt.,* 155b. His verdict must be based upon the evidence developed at the trial. *Cf. Thompson v. City of Louisville,* 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960). This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies. It was so written into our law as early as 1807 by Chief Justice Marshall in 1 Burr's Trial 416 (1807). "The theory of the law is that a juror who has formed an opinion cannot be impartial." *Reynolds v. United States,* 98 U.S. 145, 155, 8 Otto 145, 25 L.Ed. 244 (1878).

*Id.* at 726–27, 112 S.Ct. 2222 (quoting *Irvin,* 366 U.S. at 721–22, 81 S.Ct. 1639

(footnote omitted)) (internal quotation marks and parallel citations omitted).

In *Turner,* the Supreme Court relied on this passage to delineate " 'the nature of the jury trial which the Fourteenth Amendment commands when trial by jury is what the State has purported to accord.' " *Morgan,* 504 U.S. at 727, 112 S.Ct. 2222 (quoting *Turner,* 379 U.S. at 471, 85 S.Ct. 546). As reflected in the above passage, due process alone has long demanded that, if a jury is to be provided, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment. *Id.* (citing *Turner,* 379 U.S. at 472 n. 10, 85 S.Ct. 546); *cf. Groppi v. Wisconsin,* 400 U.S. 505, 508–11, 91 S.Ct. 490, 27 L.Ed.2d 571 (1971).

■ Justice Holmes expressed the guarantee of impartiality almost a century ago in *Patterson v. Colorado,* 205 U.S. 454, 462, 27 S.Ct. 556, 51 L.Ed. 879 (1907): "[t]he theory of our system is that conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." Further, if any one member of a jury is not impartial and would be unable to render a fair verdict, then the jury cannot be considered impartial. *Parker v. Gladden,* 385 U.S. 363, 366, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966). Finally, even if there is no showing of actual bias, due process is denied by circumstances that create the likelihood or the appearance of bias. *Peters v. Kiff,* 407 U.S. 493, 502, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972).

■ The Supreme Court imposes a duty of vigilance on trial judges to ensure that defendants are tried by impartial juries. Due process requires that the "trial judge [be] ever watchful to prevent prejudicial occurrences and to determine the effect of

such occurrences when they happen." *Smith v. Phillips,* 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

The Supreme Court has described the trial judge's duty to be vigilant in a number of ways. *See Chandler v. Florida,* 449 U.S. 560, 574, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981) (stating that trial courts "must be especially vigilant to guard against any impairment of the defendant's right to a verdict based solely upon the evidence and the relevant law"); *Sheppard v. Maxwell,* 384 U.S. 333, 363, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (stating that courts must take such remedial measures as are necessary to prevent prejudicial outside interference at its inception); *Remmer v. United States,* 347 U.S. 227, 230, 74 S.Ct. 450, 98 L.Ed. 654 (1954) (indicating that when a trial court becomes aware of an occurrence that may have biased a juror, the court must "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial"); *Dennis v. United States,* 339 U.S. 162, 168, 70 S.Ct. 519, 94 L.Ed. 734 (1950) (stating that when empaneling a jury, a trial court must be zealous in protecting the rights of the accused); *Mattox v. United States,* 146 U.S. 140, 149–50, 13 S.Ct. 50, 36 L.Ed. 917 (1892) (holding that no ground of suspicion that the administration of justice has been interfered with may be tolerated; the jury may not be exposed to tampering by private communications and if they are so exposed, the court must determine if tampering really took place).

■ The most important way by which a trial court can ensure that jurors are impartial is to question them. Although trial courts have broad discretion concerning questioning jurors on voir dire, their duty to ensure an impartial jury requires that when there is some special reason to inquire into a particular subject, trial courts must permit that subject to be probed. *See Mu'Min v. Virginia,* 500 U.S. 415, 430–31, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991) (stating that when jurors may have acquired knowledge of a case from an outside source they must be asked whether such information has caused them to form an opinion about the guilt or innocence of the accused); *Rosales–Lopez v. United States,* 451 U.S. 182, 188, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981) (stating that voir dire plays critical function in ensuring Sixth Amendment right to impartial jury and must be adequate to identify biased jurors); *Ristaino v. Ross,* 424 U.S. 589, 596, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976) (holding that where circumstances suggested need for voir dire to include questioning about racial prejudice such questioning must be permitted); *Irvin,* 366 U.S. at 723, 81 S.Ct. 1639 (holding that challenging party must be given the chance to show that jurors have been prejudiced); *Connors v. United States,* 158 U.S. 408, 415, 15 S.Ct. 951, 39 L.Ed. 1033 (1895) (stating that if any facts are brought to the attention of the court indicating that for some reason a juror might be biased (there, the juror's political affiliations) the court must permit inquiry into the matter).

A number of circuits have applied the above principles in different fact situations. In *Dyer v. Calderon,* 151 F.3d 970 (9th Cir.1998) (en banc), a juror's candor came into question after the jury found the defendant guilty of murder but before the start of the penalty phase. The court questioned the juror in chambers; but the questioning was extremely brief. The court of appeals reversed the district court's denial of habeas relief stating:

A court confronted with a colorable claim of juror bias must undertake an investigation of the relevant facts and circumstances. An informal in camera hearing may be adequate for this purpose; due process requires only that all parties be represented and that the in-

vestigation be reasonably calculated to resolve the doubts.

*Id.* at 974.

Respondent argues that petitioner's reliance on *Dyer* is misplaced because it is not " 'clearly established Federal law as determined by the Supreme Court.' " (Resp't's Br. at 8 (quoting § 2254(d)(1)).) However, as discussed, I review this claim under 28 U.S.C. § 2243. In any case, *Dyer* and the other circuit court decisions cited in this opinion do no more than apply the principles established by the Supreme Court.

In *United States v. Lacey*, 86 F.3d 956 (10th Cir.1996), during voir dire, one potential juror remarked in the presence of other venirepersons that his opinion of the defendant's guilt would be affected if the defendant did not take the stand and proclaim his innocence. The remark appeared to have affected two other jurors who were questioned immediately after. The defendant then moved for a mistrial. However, the trial court instructed the venirepersons that the defendant did not have to take the stand and then questioned them to determine whether the statements to the contrary made by the other jurors would prevent any of them from following the court's instruction. Thus, the court took steps to ensure that the defendant had not been prejudiced by the improper remarks. The court of appeals upheld the trial court's denial of the mistrial based in substantial part on the fact that the court "took the additional step of questioning the potential jurors in order to be certain that its instructions were heeded." *Id.* at 969.

And in *United States v. Thomas*, 463 F.2d 1061 (7th Cir.1972), after a verdict was reached but before it was published, the trial court was made aware that during deliberations several jurors had copies of a newspaper article about the case and made arguments to other jurors based on the article. The defendant asked the trial court to inquire into the extent of the jurors' exposure to the article and the trial court denied the motion. The court of appeals reversed the conviction stating that when the court was presented with evidence that the article was present in the jury room and that jurors were using it to persuade others, the court "at the very minimum [was] required to investigate further." *Id.* at 1063; *see also United States v. Boylan,* 898 F.2d 230, 258 (1st Cir.1990) (stating that trial court's "primary obligation is to fashion a responsible procedure for ascertaining whether misconduct actually occurred and, if so, whether it was prejudicial.").

### 2. Adequacy of Trial Court's Actions

Petitioner's claim is based on two separate but related occurrences. The first was when jurors Klitzka and Beers testified that other jurors had been talking about the case in the jury assembly room for four days and expressing the opinion that petitioner was guilty and the trial a waste of time. The second was when juror Schuenke stated in a letter to the court that he would probably be so concerned about his work that he could not give the trial the attention that it deserved, and that he "might just vote either way just to end it." (App. at 322.)

With respect to the disclosures by Klitzka and Beers, petitioner asked the trial court to question Klitzka about the statements in more detail and/or to question the other jurors who had been qualified to serve on the jury to determine whether the statements had affected their ability to be impartial. With respect to Schuenke's communication, petitioner asked the trial court to question Schuenke to determine whether he could conscientiously serve as a juror. The trial court denied both requests. I conclude that in both instances the trial court violated its constitutional

obligation to be vigilant to ensure an impartial jury.

### a. Failure to Inquire Into Statements in Jury Assembly Room

■ Jurors Klitzka and Beers, while under oath, put the trial court on notice that for four days jurors had been talking about the case in the jury assembly room, contrary to the court's instructions. Klitzka stated that he

> had learned more in the last three days here sitting down in that room about this case than I have since the day that it happened ... according to what I hear the young man is guilty of what he is being accused of .... and [the trial is] a waste of time.

(*Id.* at 507–09.) Beers said that prospective jurors were saying, "it's guilty, you know, right off the top of their head" and had been doing so "all during the four days." (*Id.* at 412–13.)

The trial court was also on notice that the improper communications had caused some jurors to form the opinion that petitioner was guilty. Klitzka testified that, before he went to the jury assembly room he knew little about the case, but, after hearing about it from other jurors, he concluded that petitioner was guilty and that the trial would be a waste of time. Juror George Schroeder said on voir dire that he could decide the case based on the evidence but, after spending additional time in the jury assembly room, advised the court in a letter that he had formed the opinion that petitioner was guilty. It is not unreasonable to infer that the change in his opinion was caused by statements from other jurors.

The trial court was also on notice that Klitzka was very sensitive about disclosing any details about what was said in the jury assembly room. When petitioner's counsel asked him for such information, Klitzka

responded: "No, I won't tell you that." (*Id.* at 519.)

Finally, the record makes clear that both the prosecutor and the trial court regarded the testimony of Klitzka and Beers as credible and were aware that the statements in the jury assembly room might have prejudiced petitioner. Surprisingly, the prosecutor initially suggested that it was reasonable for jurors to make such statements because they were "disgusted ... with the process." (*Id.* at 532.) It is unclear why the prosecutor thought that jurors were or had a right to be disgusted with the process. But, if they were disgusted, petitioner had reason to be concerned that their disgust was directed at him. After Beers corroborated Klitzka's revelation, the prosecutor expressed alarm and urged the court "to act immediately." (*Id.* at 417.) The prosecutor made clear that petitioner might have already been prejudiced by the communications, stating that "maybe we failed to [make clear to jurors that they were not to talk about the case]" and expressing hope that "there's been no harm done." (*Id.*) The trial court also recognized the potentially prejudicial nature of the communications because it permitted petitioner's counsel to inquire about them of the few jurors who had not undergone voir dire, and because it went to the jury assembly room over the noon recess to re-instruct jurors not to talk about the case.

Yet, despite all this, the trial court refused to question or to permit petitioner's counsel to question either Klitzka or the approximately twenty-five jurors who had been qualified to serve on the jury about the impact of the statements. The trial court turned a blind eye to the question raised both by petitioner and by the prosecutor as to whether there had been "harm done." (*Id.*) There was unrefuted, credible evidence that the final pool of jurors in-

cluded jurors who had made or possibly been influenced by the statements; yet the trial court refused to permit petitioner's counsel to find out if this was so.

With respect to Klitzka, the court appeared to embrace the prosecutor's surprising argument that asking him for further details about the statements would invade his "privacy," and that the matter was "none of [petitioner's counsel's] business." (*Id.* at 523–25.) With respect to the twenty-five jurors who had been qualified, the court stated that "the record is not there to justify making the inquiry." (*Id.* at 534.) Under the cases cited above, this statement was clearly wrong. The court knew that jurors had been making improper communications in the jury assembly room for four days and knew that the statements had prejudiced some jurors. Under the law, the court was required to "ascertain[ ] whether misconduct actually occurred and, if so, whether it was prejudicial." *Boylan*, 898 F.2d at 258.

Due process required the court to make an inquiry reasonably calculated to resolve the doubts that the testimony of Klitzka and Beers had created. *Dyer*, 151 F.3d at 974. In order to satisfy this duty, the court had a number of options available to it. The court could have commenced its inquiry by questioning Klitzka further, as petitioner repeatedly urged. Because of Klitzka's hostility to being questioned by petitioner's counsel, the court could have questioned Klitzka itself and, because he was "sensitive," could have done so in camera. Questioning Klitzka might well have provided the court and the parties with an understanding of the scope of the problem.

A second option would have been to collectively ask the jurors who had undergone voir dire whether they had made or been exposed to the improper communications. The court could have done this when it went to the jury assembly room to re-instruct jurors not to discuss the case.

If the court had asked this question, it would have discovered how many jurors had been exposed to the improper communications. With this knowledge, the court could have determined what further steps, if any, were required. Possibly the court would have been required to individually question those jurors who had been exposed to the statements to determine whether they had been prejudiced. Possibly no jurors had been prejudiced. On the other hand, the inquiry might have turned up more jurors like George Schroeder who initially said that he could be impartial but after a few days in the jury assembly room, changed his mind.

A third option would have been for the court to question or permit counsel to question the jurors who had undergone voir dire individually to determine whether they had been exposed to and influenced by the statements. This is what the court did with respect to the jurors who had not undergone voir dire.

However, the trial court did none of these things. It made no effort to ascertain whether any of the approximately twenty-five qualified jurors who had undergone voir dire had been prejudiced as a result of the statements. Thus, it did not make an inquiry that was reasonably calculated to determine whether the statements had caused jurors to be prejudiced.

The court made no effort to discover either who had made the statements or what effect they had on other jurors. By failing to make this inquiry, the court violated its duty to be "ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *See Smith*, 455 U.S. at 217, 102 S.Ct. 940. A potentially prejudicial occurrence took place, yet the court failed to determine its effect. Due process required that the court find out which, if any, jurors had been exposed to the improper

statements and whether such exposure had caused them to form a fixed opinion about petitioner's guilt. *See Mu'Min,* 500 U.S. at 431, 111 S.Ct. 1899. The requirements of due process prohibited the court from ignoring the potential harm to which it had been alerted. *See Remmer,* 347 U.S. at 230, 74 S.Ct. 450.

■ The trial court offered no rationale for permitting petitioner's counsel to question jurors who had not undergone voir dire about the statements but not jurors who had undergone voir dire. The record suggests that the prosecutor and the trial court were concerned that further inquiry might result in the loss of jurors. Both used the phrase "Pandora's box" to describe their concern. (App. at 323, 325.) Nevertheless, once the court was put on notice of the improper statements, it was obliged to determine whether the statements caused jurors to become prejudiced. The fact that, because of the notoriety of the case, it was hard to find impartial jurors did not exempt the court from its obligation to "be zealous to protect the rights of an accused." *Dennis,* 339 U.S. at 168, 70 S.Ct. 519. If anything, the court should have been particularly cautious. *See Murphy v. Florida,* 421 U.S. 794, 803, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975) (stating that where there is widespread hostility to a defendant, the reliability of jurors' declarations of impartiality is subject to doubt).

■ The state court of appeals stated that, because of his coercion defense, petitioner wanted jurors who had knowledge about his relationship with his father. However, nothing in the record indicates that petitioner wanted jurors who made or were influenced by statements by other jurors that he was guilty and the trial a waste of time. No matter how strong the evidence is against a defendant or what the defense is, the Sixth Amendment and the Due Process Clause require that the

jury be impartial. *Irvin,* 366 U.S. at 721–22, 81 S.Ct. 1639.

## b. Failure to Inquire of Schuenke

■ As previously indicated, after he had been questioned on voir dire but before the jury had been selected, juror Schuenke wrote to the court stating that he would probably be so concerned about his work that he could not give the trial the attention it deserved, and that he "might just vote either way just to end it." (App. at 322.) When the court did not excuse him, Schuenke made a disrespectful statement to the court saying, "I asked to speak to you two days ago. You mean I can't have five minutes of your time?." And when the court said that it had addressed his concerns, he made a second disrespectful statement: "Not to me they weren't you know." (Answer Ex. B2 at 216–17.)

When apprised of Schuenke's letter, petitioner requested that Schuenke be removed for cause or, at a minimum, be questioned to determine whether he could perform the duties of a juror. Petitioner's counsel stated:

> [A] juror that's basically saying they can't take their responsibility seriously. I mean if . . . they can't fulfill their duty despite the instructions and . . . they're not going to vote their conscience and listen to the evidence and deliberate according to law, obviously . . . some further inquiry or record [is required].

(App. at 322) The prosecutor also recognized that Schuenke's letter raised a serious question as to whether Schuenke could satisfy the obligations of a juror and stated that he would leave the matter "up to the court." (*Id* at 324.) However, the trial court not only refused to remove Schuenke, it also refused to question him about whether he would decide the case on

the evidence or "vote just to end it." (*Id.* at 322.).

As stated, a trial court has a duty to be vigilant to ensure that a defendant will be tried by twelve jurors willing to follow the court's instructions. *See Morgan*, 504 U.S. at 730, 112 S.Ct. 2222 (stating that part of the guarantee of a defendant's right to an impartial jury is to be able to question jurors sufficiently to identify those who are unqualified); *Rosales–Lopez*, 451 U.S. at 188, 101 S.Ct. 1629 (stating that without adequately questioning jurors, "the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled"); *see also Irvin*, 366 U.S. at 722–23, 81 S.Ct. 1639 (holding that a defendant must be afforded the opportunity to determine whether a juror is capable of deciding the case fairly).

■■■ The Seventh Circuit is particularly zealous about protecting the right to a probing voir dire. *Fietzer v. Ford Motor Co.*, 622 F.2d 281, 284 (7th Cir.1980). Trial courts may not "block the reasonable exploration of germane factors that might expose a basis for challenge whether for cause or peremptory." *United States v. Lewin*, 467 F.2d 1132, 1138 (7th Cir.1972). Further, when an issue arises concerning a juror's ability to decide the case on the evidence, it raises a judicial duty " 'to do what [is] reasonably practicable to ... prevent unfairness in the trial.' " *United States v. Dellinger*, 472 F.2d 340, 370 (7th Cir.1972) (quoting *Bailey v. United States*, 53 F.2d 982, 984 (5th Cir.1931)).

Schuenke's letter put the court on notice that he might not follow the court's instructions to decide the case on the evidence. The letter was a threat that he would not be an impartial juror. This should have been a giant red flag for the court. Instead, the court ignored it. The content of the letter imposed a duty on the

court to question Schuenke further. The court was obligated to determine whether Schuenke's desire not to serve on the jury would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt*, 469 U.S. 412, 433, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)). Due process prohibits a trial court from allowing a venireman who has threatened not to decide the case based on the evidence to serve on a jury without at least inquiring into whether the threat is a sincere one.

### c. Conclusion

Because it failed to adequately inquire into the statements that Klitzka and Beers reported were made in the jury assembly room and into whether Schuenke could fairly decide the case, the trial court breached its duty to ensure petitioner an impartial jury.

■■■ In both instances, the court was obliged to make an inquiry when the problem arose. Neither the impact of the statements nor Schuenke's willingness to decide the case on the evidence could have been addressed in a post-conviction proceeding because a juror cannot testify about "the effect of anything upon the juror's or any other juror's mind or emotions as influencing the juror to assent or dissent from the verdict." Wis. Stat. § 906.06(2); *see also Tanner v. United States*, 483 U.S. 107, 127, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987) (stating that jury deliberations are protected from intrusive inquiry). The time to inquire into whether jurors' opinions and attitudes would prevent them from serving as jurors is when the court is in a position to do something about it. *See Sheppard*, 384 U.S. at 363, 86 S.Ct. 1507 (stating that courts must

take such remedial measures as are necessary to prevent prejudicial outside interference at its inception); *see also Rushen v. Spain,* 464 U.S. 114, 128 n. 6, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (Stevens, J., concurring) (stating that meaningful time for hearing is when doubts about impartiality can be remedied by replacing juror).

In conclusion, the trial court breached its duty to be vigilant to ensure that petitioner was tried by an impartial jury and, therefore, denied petitioner due process of law and the right to an impartial jury. Therefore, petitioner's application for the writ of habeas corpus must be granted.

## B. Claim That Petitioner Was Denied Due Process and Right to an Impartial Jury Because Biased Juror Served on Jury

Petitioner also claims that he was denied due process and the right to an impartial jury because Schuenke, who served on the jury, was biased and committed misconduct. Petitioner claims that the evidence supports the conclusion that Schuenke was one of the jurors who made the improper statements in the jury assembly room, and that such statements indicate that Schuenke was biased. Petitioner also claims that by not disclosing on voir dire the opinions he expressed in the jury assembly room, Schuenke committed misconduct.

With respect to this claim, the state court of appeals denied relief because it determined as a factual matter that Schuenke was not biased and did not commit misconduct. *Theodore Oswald,* 232 Wis.2d at 87, 606 N.W.2d 207. I, therefore, review the state court decision under 28 U.S.C. § 2254(d)(2) and ask whether the determination on which it rested was "unreasonable ... in light of the evidence presented." 28 U.S.C. § 2254(d)(2); *see* Herz & Liebman, *supra,* § 20.2(c).

 As previously indicated, a defendant has a constitutional right to an impartial jury. *Morgan,* 504 U.S. at 726–27, 112 S.Ct. 2222. If even one juror is biased, the jury cannot be considered impartial. *Parker,* 385 U.S. at 366, 87 S.Ct. 468. A biased juror is one who holds an opinion as to the defendant's guilt that he cannot set aside. *Patton v. Yount,* 467 U.S. 1025, 1036, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). Further, a new trial is required if a defendant "demonstrate[s] that a juror failed to answer honestly a material question on voir dire, and then further show[s] that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip. Inc., Inc. v. Greenwood,* 464 U.S. 548, 556, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984). The question of whether a juror was biased and/or committed misconduct is one of historical fact. *Patton,* 467 U.S. at 1036, 104 S.Ct. 2885. I owe deference to state court determinations of factual issues; but even in the context of federal habeas corpus, "deference does not imply abandonment or abdication of judicial review." *Miller–El v. Cockrell,* —— U.S. ——, ——, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003). A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude that the decision was unreasonable. *Id.*

The question of whether Schuenke was biased and/or committed misconduct was addressed at a post-conviction hearing. *See Tanner,* 483 U.S. at 127, 107 S.Ct. 2739 (stating that after a trial a party may seek to impeach a verdict by non-juror evidence of misconduct). Petitioner presented the testimony of Jacqueline Mihm, one of the twenty-nine jurors in the final pool. Mihm was in the jury assembly room during all four days of jury selection.

Mihm testified that in the jury assembly room she heard "three men ... state[ ]

that the defendant was guilty and the trial ... a waste of time." (App. at 601.) She testified that these men said that they had "no doubt about his guilt," and "stated these opinions in conversations in groups with other jurors." (*Id.* at 601–02.) She also testified that jurors made comments "about the trial being a joke or a sham ... [and] a waste of money because ... defendant was guilty." (*Id.* at 602.) She testified that one of the men making the comments "that the Oswalds were guilty and ... that the trial was a waste of time" made these comments on all four days of jury selection and that he stood out in her memory because he was "actively trying to get off the jury." (*Id.* at 626–27.) She also remembered him because he was "the man who spoke up to the judge" (*id.* at 602), and because "he didn't get his wish" to be excused from the jury (*id.* at 626).

The trial court rejected Mihm's testimony and denied petitioner's motion for a new trial. The state court of appeals affirmed the denial of the motion but not on the ground that Mihm was untruthful. Rather, it assumed that Schuenke made the statements testified to by Mihm but found that the statements did not evidence bias or prove misconduct.

■ I conclude that the state courts' decisions were both based on "unreasonable determination[s] of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2). The evidence establishes that Schuenke made the improper statements and that he was biased and committed misconduct.

Addressing the trial court's decision first, I note that in rejecting Mihm's testimony the court did not rely even in part on demeanor evidence. Thus, the principal reason for deferring to a trial court's credibility determination, that it has observed the witness's demeanor, is not present in this case. *See Miller–El,* —— U.S. at ——, 123 S.Ct. at 1040 (explaining that reason

for deference to trial court credibility determinations is because trial court is in a position to assess demeanor).

The trial court gave several reasons for rejecting Mihm's testimony. The first was that she did not speak up to the bailiff or the court about the improper statements in the jury assembly room when they occurred. However, no other juror did either. That Mihm was not a whistle-blower is not a persuasive reason for rejecting her testimony. The court also stated that petitioner did not call other witnesses to corroborate Mihm. However, there were a limited number of potential witnesses to Schuenke's conduct, and testifying in support of petitioner was hardly an attractive prospect. Thus, petitioner's failure to produce other witnesses is not a good reason for negating Mihm's testimony.

The main reason that the court gave for rejecting Mihm's testimony was her answers to several questions on the juror questionnaire. Mihm had contacted police about physical threats by her husband; thus, she should have answered "yes" instead of "no" to questions asking whether she had been a victim of spousal abuse or crimes of violence. In response to another question on the questionnaire, however, she acknowledged that she had contacted the police because of domestic problems. Further, she was candid about these problems during voir dire; and the court and counsel appeared to be satisfied with her answers and with her because neither party asked that she be excused.

The trial court also stated that Mihm should have mentioned her emotional problems and medications in response to an inquiry in the questionnaire asking "whether she had health problems or disabilities, either physical or emotional *that would affect service for jury duty?*" (App. at 609 (emphasis added).) However, Mihm properly answered "no" to the ques-

tion because she did not believe that she had a condition that affected her ability to serve as a juror, and there is no evidence in the record suggesting that she had such a condition.

Thus, the trial court strained to reject Mihm's testimony. Because she gave inaccurate or incomplete answers to several sensitive questions, the court treated her testimony about what occurred in the jury room as unreliable. (Answer to Pet. Ex. B 10 at 28.)

This determination was unreasonable, primarily, because all or nearly all of Mihm's testimony was corroborated by other evidence. Her testimony that jurors were saying that petitioner was guilty and the trial a waste of time was corroborated by Klitzka and Beers. The only information that she added was that one of the jurors making the statements was Schuenke. And, to a considerable extent, this testimony was corroborated by Schuenke's own behavior. Schuenke's willingness to engage in conduct disrespectful of the court, including threatening not to decide the case on the merits and verbally challenging the judge, suggests that he would have had little compunction about violating the court's order not to make statements about the case to other jurors. His other disrespectful conduct appears to have been of a piece with telling fellow veniremen that petitioner was guilty and the trial a waste of time.

The manner in which Mihm identified Schuenke also strongly suggests that her testimony was truthful. She testified that she remembered one of the men who made the improper statements because of his "definitely not wanting to be on the jury" (App. at 626), and because he was "the man who spoke up to the judge" (*id.* at 602). She also described him as the man who asked "why ... the judge had not responded to a letter that he had written about ... not wanting to serve on the

jury," and said that "when the final tally was taken ... he didn't get his wish" and "was on the jury." (*Id.* at 626–27.) All of her descriptions of the man who made the statements clearly point to Schuenke; and it seems highly unlikely that they were concocted. Finally, nothing in the record suggests that Mihm had a motive to testify falsely or that emotional problems caused her to do so. Thus, the record, fairly assessed, does not support the trial court's rejection of Mihm's testimony.

■ The state court of appeals approached the question of whether Schuenke was biased differently than the trial court. It assumed that Mihm testified truthfully but found that Schuenke's statements did not indicate bias or misconduct. This determination was even more strained than the trial court's, and it too was unreasonable.

■ Schuenke was biased because his statements in the jury assembly room show that he held a fixed opinion that petitioner was guilty and had not set aside his opinion. A juror who holds the opinion that a defendant is guilty and a trial a waste of time is biased. *See Patton*, 467 U.S. at 1036, 104 S.Ct. 2885. Schuenke's statements demonstrate not only that he thought that petitioner was guilty, but that his opinion was so fixed that he considered it unnecessary even to hold a trial. Another indication of how fixed Schuenke's opinion was was that he could not resist repeating it for four days in violation of the court's order. Additionally, Schuenke expressed this opinion after he had been questioned on voir dire, thereby demonstrating that he could not set aside his view that petitioner was guilty even after being made aware that he was required to do so. Thus, Schuenke's statements in the jury assembly room demonstrate that he had a fixed opinion that petitioner was guilty, and that he had not set such opinion

aside. Therefore, he was not an impartial juror.

The court of appeals's determination that his statements were compatible with being open to petitioner's coercion defense was also manifestly unreasonable. A juror who believes that a defendant's guilt is so firmly established that it is unnecessary to hold a trial cannot reasonably be said to be open to any defense.

Schuenke's statements in the jury assembly room were also inconsistent with his answers on voir dire. On voir dire, the prosecutor asked Schuenke whether he could "decide this case based solely on the evidence," to which Schuenke replied, "sure." (App. at 307–08.) Petitioner's counsel asked him if he would have an open mind concerning the charges, and Schuenke said "yeah." (*Id.* at 308–09.) Petitioner's counsel then asked if he had an open mind about any possible defenses, and Schuenke said "yeah." (*Id.* at 309.) Petitioner's counsel then asked Schuenke if he had formed an opinion about petitioner, and Schuenke responded "no." (*Id.*) Finally, petitioner's counsel asked Schuenke if he had expressed any opinions about the case, and Schuenke replied, revealingly, that he might have said something like "what a waste," but that after he got the jury packet he tried to "keep . . . pretty much out of it." (*Id.* at 310.)

Thus, on voir dire Schuenke indicated that he would be impartial, and at that time both parties accepted him as a juror. His statements in the jury assembly room showed that his answers on voir dire were untruthful. Moreover, his answers related to a material question, whether petitioner was guilty. A truthful answer would have provided a valid basis for his removal. *See McDonough Power Equip.*, 464 U.S. at 556, 104 S.Ct. 845 (stating that juror who fails to provide honest answer commits misconduct if honest answer would have created valid challenge for cause).

Schuenke did not say on voir dire that he thought that petitioner was guilty and the trial a waste of time. If he had, he would have been removed as a juror. When he told the court and counsel on voir dire that he had an open mind and would decide the case on the evidence, and then turned around and, out of their presence, told other jurors that petitioner was guilty and the trial a waste of time, Schuenke expressed opinions about the case that were inconsistent and irreconcilable. Thus, the court of appeals's determination that petitioner did not misrepresent his opinion on voir dire and, therefore, did not commit misconduct was also an unreasonable determination of the facts in light of the evidence.

For the reasons stated, the court of appeals's decision denying petitioner relief was based on its unreasonable factual determination that Schuenke was not biased and did not commit misconduct. Schuenke was biased and committed misconduct and he served on the jury that convicted petitioner. If one member of a jury is not impartial, then the jury cannot be considered impartial. *Parker*, 385 U.S. at 366, 87 S.Ct. 468. Therefore, petitioner was denied his right to an impartial jury and to due process as well. Thus, on this claim, the writ of habeas corpus must issue pursuant to § 2254(d)(2).

## C. Claim that Rights to Due Process and Impartial Jury Were Denied Because State Courts Arbitrarily Deprived Petitioner of Statutory Rights Relating to Jury Selection

Petitioner claims that he was denied due process and an impartial jury because the state courts arbitrarily deprived him of state statutory rights relating to jury selection. He contends that he was substantially harmed when the trial court erred in failing to remove three jurors for cause and the court of appeals erred in not

granting him a new trial on the ground that he was forced to use peremptory strikes to remove the biased jurors. The state court of appeals denied petitioner relief based on its factual determination that the jurors in question were not biased. I, therefore, review the court's decision under 28 U.S.C. § 2254(d)(2).

### 1. Applicable Law

 A federal court may not issue a writ of habeas corpus on the basis of a perceived error of state law. *E.g., Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). The Due Process Clause, however, also requires that states not act arbitrarily or irrationally, *Honda Motor Co. v. Oberg,* 512 U.S. 415, 434, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994) (stating that the Due Process Clause's "whole purpose is to prevent" arbitrary deprivation of liberty or property), or deny fundamental fairness, *Bearden v. Georgia,* 461 U.S. 660, 673, 103 S.Ct. 2064, 76 L.Ed.2d 221 (1983) (stating that "fundamental fairness [is] required by the Fourteenth Amendment").

 When a state grants criminal defendants certain statutory rights, it may create "a substantial and legitimate expectation" on their part that they will not be deprived of their liberty in violation of such rights. *Hicks v. Oklahoma,* 447 U.S. 343, 346, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980). And, if the state arbitrarily disregards the rights it has created, it may be found to have violated due process of law. *Id.* In *Hicks,* a jury sentenced the defendant to a mandatory forty-year prison term under a provision of the Oklahoma habitual offender statute. After Hicks's conviction, the state court of appeals found the statute unconstitutional. When Hicks attempted to have his sentence set aside, the state court of appeals held that, despite the unconstitutionality of the statute, Hicks's sentence fell within the permissible range of punishment for his conviction and

refused to order resentencing. The Supreme Court vacated the sentence because the state had provided a statutory right to have criminal sentences imposed at the discretion of a jury. The defendant's entitlement to jury sentencing constituted a "liberty" interest protected by the Fourteenth Amendment. *Id.* The Court viewed Oklahoma's denial of Hicks's state law entitlement to be sentenced by a jury as an "arbitrary disregard of the petitioner's right to liberty." *Id.* Finding a due process violation, the Court rejected the state's argument that "all that is involved in this case is the denial of a procedural right of exclusively state concern." *Id.* at 346–47, 100 S.Ct. 2227. *See also Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 433–34, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982) (holding that a state procedure foreclosing litigants from presenting certain claims denied due process because it denied a state created entitlement in a "random" manner).

In *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), the Supreme Court discussed the application of the principle stated in *Hicks* in the context of jury selection. In *Ross,* the petitioner argued that his right to due process was abridged because he was arbitrarily deprived of the full complement of nine peremptory challenges allowed under Oklahoma law. The court rejected petitioner's claim based on its conclusion that he had received "all that was due [him] under Oklahoma law." *Id.* at 91, 108 S.Ct. 2273. The court's analysis of the petitioner's due process claim rested upon the fundamental precept that "peremptory challenges are a creature of state law and are not required by the Constitution." *Id.* at 89, 108 S.Ct. 2273. While acknowledging that "the right to exercise peremptory challenges is 'one of the most important of the rights secured to the accused,'" the majority stated that it was "for the State to determine the number of peremptory challenges

allowed and to define their purpose and the manner of their exercise." *Id.* (quoting *Swain v. Alabama,* 380 U.S. 202, 219, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), *overruled on other grounds by Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)).

Thus, the question of whether the petitioner's right to due process was violated necessitated an inquiry into whether petitioner received all that he was entitled to under Oklahoma law. *Id.* The court then pointed out that Oklahoma law required counsel to remedy a trial court's error in denying a removal for cause by exercising a peremptory challenge. Thus, the petitioner had not been deprived of any of his rights under Oklahoma law and, therefore, his claim of a violation of his due process right lacked merit. *Id.* at 91, 106 S.Ct. 1712.

Similarly, in *United States v. Martinez–Salazar,* 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000), a federal district court erred in refusing to remove a juror for cause, causing the defendant to use one of the ten peremptories allotted to him under Fed.R.Civ.P. 24(b) to remove the juror. Applying the *Ross* analysis, the Court reasoned that the defendant could have left the biased juror on the jury and challenged the trial court's decision on appeal but chose not to, and therefore received all that he was entitled to under Rule 24(b). Thus, he was not denied due process. *Martinez–Salazar,* 528 U.S. at 315–16, 120 S.Ct. 774.

Additionally, both *Ross* and *Martinez–Salazar* make clear that when a defendant's loss of peremptories due to a trial court's failure to remove biased jurors results in a biased juror sitting on the jury, the rights to due process and an impartial

jury are denied. *Martinez–Salazar,* 528 U.S. at 316, 120 S.Ct. 774 (citing *Ross,* 487 U.S. at 85, 108 S.Ct. 2273).

Thus, when a state court defendant argues that due process and the right to an impartial jury were denied because he was deprived of his right to peremptory strikes, the critical question, under *Ross,* is whether the defendant received all that he was entitled to under state law. In the present case, petitioner asserts that he got nothing of what he was entitled to under state law. He argues that he was deprived not only of the peremptory strikes to which state law entitled him, but also of his right to a new trial if he used peremptory strikes to correct trial court errors and was substantially harmed as a result.

## 2. Rights of Which Petitioner was Deprived

Wisconsin provides criminal defendants with certain protections in connection with jury selection. First, Wis. Stat. § 805.08(1) requires trial judges to remove jurors who are "not indifferent in the case." Thus, while defendants in all jurisdictions have a right to an impartial jury under the Sixth Amendment, Wisconsin defendants have a specific statutory entitlement to have trial courts remove biased jurors. Second, Wis. Stat. § 972.03 guarantees defendants a specific number of peremptory strikes (in petitioner's case, seven). Finally, in *State v. Lindell,* 245 Wis.2d 689, 746–47, 629 N.W.2d 223 (2001), the Wisconsin Supreme Court held that if a defendant uses some of his statutorily provided peremptory strikes to correct trial court failures to remove biased jurors, and if the loss of such peremptories affects his substantial rights he is entitled to a new trial.[1]

---

1. *Lindell* overruled *State v. Ramos,* 211 Wis.2d 12, 564 N.W.2d 328 (1997), which held that a defendant who used a peremptory to correct a trial court's failure to remove a

biased juror was entitled to a new trial even without showing that he was harmed. Petitioner's trial was held before either *Ramos* or

In the present case, petitioner was deprived of all three of these rights. First, the trial court failed to remove jurors who were not indifferent. Second, petitioner used three of his peremptories to correct the trial court's errors. Third, notwithstanding that petitioner was harmed by losing his peremptories, the court of appeals failed to grant him a new trial.

### a. Deprivation of Right to Have Trial Court Remove Biased Jurors

 Petitioner argues that the trial court violated § 805.08(1) by failing to remove jurors Goldberg, Weidler and Tonn for bias. Respondent makes no attempt to argue that these jurors were impartial. However, even if respondent had contested the issue, I would find that none of the three were impartial.

 The word "indifferent" in § 805.08(1) codifies the requirement of the Sixth Amendment and its state counterpart that jurors be impartial. *State v. Faucher*, 227 Wis.2d 700, 715, 596 N.W.2d 770 (1999). Under the Sixth Amendment, a juror's impartiality is determined by the following test: did the "juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Patton*, 467 U.S. at 1036, 104 S.Ct. 2885 (citation omitted). This standard is a federal constitutional one; however, the determination of whether a juror can in fact satisfy it is owed special deference by a habeas court. *Id.* at 1037 n. 12, 104 S.Ct. 2885 (citations omitted). Nevertheless, "deference does not imply abandonment or abdication of judicial review." *Miller–El,* ——

U.S. at ——, 123 S.Ct. at 1041. The question is whether the determinations by the state courts that jurors Goldberg, Weidler and Tonn were impartial were "reasonable" in light of the record evidence. *See* 28 U.S.C. § 2254(d)(2).

 To be impartial, a juror must be able to " 'lay aside his impression or opinion and render a verdict based on the evidence presented in court.' " *Murphy*, 421 U.S. at 800, 95 S.Ct. 2031 (quoting *Irvin*, 366 U.S. at 723, 81 S.Ct. 1639). In *Murphy*, the Court also said that even if a juror declared his impartiality, the atmosphere in a community could be considered in determining declarant's veracity:

> In a community where most veniremen will admit to a disqualifying prejudice, the reliability of the others' protestations may be drawn into question; for it is then more probable that they are part of a community deeply hostile to the accused, and more likely that they may unwittingly have been influenced by it.

*Id.* at 803, 95 S.Ct. 2031.

 Thus, *Patton* and *Murphy* require that in order to satisfy the federal constitutional standard of impartiality, a juror must unequivocally declare that he can set aside his opinion that a defendant is guilty and decide the case on the evidence. The Seventh Circuit has made clear that jurors who are unable to give unequivocal assurances that they can relinquish their prior beliefs for purposes of deciding the case must be removed for cause. *Thompson v. Altheimer & Gray*, 248 F.3d 621, 626 (7th Cir.2001).

*Lindell* was decided; thus, it is unclear what rule was in effect at the time. However, in *Lindell,* the court pointed out that the *Ramos* court had failed to consider Wis. Stat. § 805.18(2), Wisconsin's harmless error statute. Thus, I will assume that the rule announced in *Lindell* was applicable at the time

petitioner was tried, and that petitioner was entitled to a new trial based on having to use peremptories to correct trial errors in failing to remove biased jurors only if the resulting loss of peremptories actually caused him harm.

When a prospective juror manifests a prior belief that is both material and *contestable* ... it is the judge's duty to determine whether the juror is capable of suspending that belief for the duration of the trial. When as in this case the record contains no assurances that the belief is "shakable," that the prospective juror can exercise a judgment unclouded by that belief, the verdict cannot stand.

*Id.* at 627. In *Thompson,* the juror in question said that "she would *try* to be fair, but she expressed no confidence in being able to succeed in the attempt." *Id.* at 626. The juror failed to give those "unequivocal assurances" that the law requires. *Id.* Therefore, the trial court's refusal to excuse her for cause was error. *Id.* at 626–27.

Decisions in other circuits are to the same effect. Jurors cannot be found to be impartial under the Sixth Amendment based on statements that fall short of assurances that they can lay aside biased opinions for the duration of the trial. On this point, the Sixth Circuit stated:

In the absence of an affirmative and believable statement that these jurors could set aside their opinions and decide the case on the evidence and in accordance with the law, the failure to dismiss them was unreasonable. *See Patton,* 467 U.S. at 1036, 104 S.Ct. 2885, 81 L.Ed.2d 847.

From the record before us, it appears that the trial judge based his findings of impartiality exclusively upon each juror's tentative statements that they would try to decide this case on the evidence presented at trial. Such statements, without more are insufficient. . . .

*Wolfe v. Brigano,* 232 F.3d 499, 503 (6th Cir.2000).

The Eighth Circuit held similarly in *United States v. Sithithongtham,* 192 F.3d 1119, 1121 (8th Cir.1999). There, a pro-spective juror was questioned on voir dire as follows:

Q: So you think you could be fair and impartial under the circumstances, or do you think it would be difficult for you?

A: No, I'm sure I could *probably* be fair and impartial.

The court found that the district court erred in refusing to strike the juror for cause, stating: "[A] juror who 'would probably give [law enforcement officers] the benefit of the doubt,' is not what we would consider impartial. Nor is a juror who 'could probably be fair and impartial.' 'Probably' is not good enough." *Id.*

The Ninth Circuit observed that if prospective jurors cannot give unequivocal assurances that they will be impartial, there is no basis for the court and counsel to have confidence that the trial will be a fair one.

A juror is considered to be impartial only if he can lay aside his opinion and render a verdict based on the evidence presented in court. Doubts regarding bias must be resolved against the juror. When a juror is unable to state that she will serve fairly and impartially despite being asked repeatedly for such assurances we can have no confidence that the juror will lay aside her biases or her personal experiences and render a fair and impartial verdict. . . .

*United States v. Gonzalez,* 214 F.3d 1109, 1114 (9th Cir.2000) (internal quotation marks and citations omitted).

Finally, the rule was eloquently stated by Chief Judge Kaye of the New York Court of Appeals in a recent criminal case:

What we can—and do—ask, however, is that every juror enter the trial with an open mind, that every juror not be prejudiced from the outset against any particular party, and that every juror be

willing to decide the case solely on the evidence presented and the law instructed by the Trial Judge.

... Upon a challenge, a juror who has revealed doubt, because of her prior knowledge or opinion, about her ability to serve impartially must be excused unless the juror states *unequivocally* on the record that she can be fair .... [J]urors must clearly express that any prior experiences or opinions that reveal the potential for bias will not prevent them from reaching an impartial verdict. If there is any doubt, the trial court should err on the side of excusing the juror.

*People v. Arnold,* 96 N.Y.2d 358, 729 N.Y.S.2d 51, 753 N.E.2d 846, 850–51 (2001) (internal citations omitted and emphasis added).

In its decision in the present case, the state court of appeals indicated that something less than a juror's unequivocal statement that he could set aside his opinion and decide the case solely on the evidence was a sufficient basis on which to rest a finding of impartiality. *Theodore Oswald,* 232 Wis.2d at 85–86, 606 N.W.2d 207. However, the rule that a juror may not be found to be impartial unless he can provide assurances that he is able to lay aside his opinion and render a verdict based solely on the evidence is a federal constitutional requirement, *Patton,* 467 U.S. at 1037 n. 12, 104 S.Ct. 2885; and Wisconsin courts are not free to disregard or dilute it.

With the foregoing principles in mind, I turn to the question of whether the determinations by the state courts that jurors Goldberg, Weidler and Tonn would be impartial were unreasonable.

#### i. Goldberg

On voir dire, Goldberg was questioned first by the court. He said that his opinion was "that [petitioner was] guilty." (App. at 704.) The court then asked him wheth-er he could decide the case based on the evidence, to which Goldberg replied, "that would probably be very difficult." (*Id.*) The court then asked him why it would be difficult and Goldberg responded: "I guess because this has gone on for so long. I've had time to think about it." (*Id.*) In response to another question, Goldberg added, "I guess my mind is pretty well set." (*Id.* at 705.) The court then asked Goldberg if his mind was set even though the information he may have heard might not be entirely accurate. Goldberg said: "That's correct." (*Id.*)

The prosecutor then asked Goldberg whether, if the evidence were different from what he read, he could decide the case based on what he heard in court. Goldberg said: "I would hope I'd have an open enough mind to be able to do that." (*Id.* at 707.) The prosecutor asked if Goldberg would try, and Goldberg said, "I'd try." (*Id.*) The prosecutor then asked Goldberg if his mind was set because of what he had read and Goldberg responded: "That and the way I feel in my own personal morals." (*Id.* at 708.)

Then petitioner's counsel questioned Goldberg and asked if he felt pretty strongly that petitioner was guilty and Goldberg said: "That's correct." (*Id.* at 710.) Petitioner's counsel asked if it would take a lot to convince him that petitioner was not guilty and Goldberg replied: "Yes, it would." (*Id.* at 711.) Petitioner's counsel asked whether he felt strongly about that, and Goldberg said, "I do." (*Id.*) Petitioner's counsel asked if he would have a hard time presuming the defendant was innocent and Goldberg said, "I think I would." (*Id.* at 712.) Petitioner's counsel then asked whether he could keep an open mind during the trial, and Goldberg responded: "It probably would be very difficult." (*Id.*) In response to a question as to whether his belief would prevent him from

keeping an open mind, Goldberg replied: "That's correct." (*Id.*) In response to additional questions, Goldberg said that he favored the prosecutor's side and that it would be very difficult for him to be impartial. Petitioner's counsel asked whether, if the judge told him to disregard his beliefs he could do so, and Goldberg said: "I honestly don't know." (*Id.* at 713.) He then said that he did not think that he should be a juror in the case because he felt so strongly that petitioner was guilty. Petitioner's counsel then asked if Goldberg expected him to prove that petitioner was not guilty to which petitioner replied, "Yes." (*Id.* at 714.) Goldberg then added: "I would like to see him get a fair trial but it would be difficult for me." (*Id.*)

The prosecutor then asked several follow-up questions. First, he said, "Mr. Goldberg, not to beat a dead horse, what I'm hearing you say is based on what you heard or read about the case you have a believe of feeling as to the guilt or innocence of Theodore Oswald?" (*Id.* at 715.) To which Goldberg replied, "I have formed a very strong opinion, that is correct." (*Id.*) The prosecutor then asked him whether if he heard something different during the trial he could change his mind, and Goldberg replied: "I guess it would have to be a very strong point to change my mind at this point." (*Id.* at 715–16.)

Petitioner then asked that Goldberg be removed for cause; and the court denied the motion. The state court of appeals affirmed the trial court's determination.

The state courts' findings that Goldberg was impartial were manifestly unreasonable. Goldberg said that he had a strong opinion that petitioner was guilty, and he never said that he could set that opinion aside and decide the case on the evidence. He said that he would try to be fair; but even this statement was made in the context of others indicating that it would be difficult for him to decide the case on the

evidence, that his mind was pretty well set, that he felt strongly that petitioner was guilty, that he would have a hard time presuming petitioner was innocent or keeping an open mind during the trial, and that he did not know if he could disregard his beliefs.

Thus, the record contained no assurance that Goldberg's belief in petitioner's guilt was "shakable," and no indication that Goldberg had any confidence that he would be "able to succeed in the attempt" to be fair. *See Thompson*, 248 F.3d at 626–27. Goldberg did not come close to meeting the Sixth Amendment standard of impartiality as defined in *Patton* and *Murphy*. I emphasize here that that issue is not one of credibility. No one disputes that Goldberg was telling the truth. The issue is interpretive, *see Thompson*, 248 F.3d at 625: did Goldberg's statements manifest a degree of bias sufficient to make unreasonable the state courts' decisions that he need not have been removed? There can be no doubt that the answer to that question is yes.

### ii. Weidler

Weidler stated in her questionnaire and on voir dire that petitioner was guilty. In response to the court's questions, she said that she was home when the incident happened and she looked out her window and saw about eleven squad cars flying by. She felt that she "might not be able to be really fair to Mr. Oswald because of the fact that that created such a trauma and that you automatically think, well, you're not really safe even if you're in your own home." (App. at 804). In response to further questioning, she added: "You're not safe. You think you're safe, you have your doors locked but they come on through. It was a scary thought to me. It still is a scary thought to me." (*Id.* at 804–05.) The court then asked her wheth-

er she could decide the case on the evidence, and she said: "I would try. I'm not sure how that affects you. I don't know if you can totally block that out of your mind." (*Id.* at 806–07.)

The prosecutor then asked her whether she could set aside her opinion and Weidler answered: "I don't know. I think it's kind of hard to answer. I think I would try." (*Id.* at 808.) The prosecutor then asked her almost the identical question a second time and Weidler again replied: "I don't know. I guess, um, I feel like I would try. I feel, you know, still kind of traumatized over it because of the fact of the hostage situation. I guess but I think I would try. I realize that would be my job or my duty here." (*Id.* at 809.)

Petitioner's counsel then questioned Weidler about petitioner's defense of coercion, which had previously been explained, and she said that "there may be reasons we do things, but that doesn't excuse the behavior." (*Id.* at 811.) She subsequently added, "I still really feel that you always have a choice .... I think we all know right from wrong." (*Id.* at 812.) Petitioner's counsel asked if she could consider the defense if the judge instructed her to do so. She said: "I think it's really hard at this time. I think you would try. I'm not sure that you could .... If I were instructed to do it, obviously I would try. I don't know if I could." (*Id.* at 813.) He then asked her if she could be an impartial juror, considering what she had read or seen in the media. Weidler responded:

> I guess I would try is the best answer I can give you .... I guess I'm more concerned from the trauma that I feel and the anger and I'm not sure I can be impartial on that aspect. I think I would try as far as the media thing if that's what you ask me.

(*Id.* at 814.) With respect to the trauma, she added: "It really makes me angry.

It's taken away the feeling of safety within my own home." (*Id.*)

The court then questioned Weidler further and asked if she could follow its instructions that the law may excuse certain conduct from criminal liability if certain facts are proven. Weidler responded: "I guess I would try to follow your instructions. I guess I probably have a problem with that part of the law, umm, my conservative mind but I would try." (*Id.* at 817.) The judge then asked, even if she did not necessarily agree with the law, would she be willing to try to follow it; and Weidler said that she "would try to." (*Id.*)

Thus, like Goldberg, Weidler started with the opinion that petitioner was guilty and never said that she could lay aside her opinion and decide the case on the evidence. At most, she said that she would try to do so. However, she said that she would be unable to even try to set aside her feeling that she was no longer safe: "I guess I'm more concerned from the trauma I feel and the anger and I'm not sure I can be impartial on that aspect. I think I would try as far as the media thing." (*Id.* at 814.) And even her statement that she would try to set aside her opinion that petitioner was guilty was hedged with qualifiers, such as her statements about her openness to coercion defense: "I think it's really hard at this time .... I don't know if I could .... [W]e all know right from wrong." (*Id.* at 812). Again, the issue is not one of credibility. Weidler was obviously sincere, but she too fell far short of satisfying the standard for being considered impartial. What was missing were the " 'unwavering affirmations of impartiality' " necessary to ensure that the defendant will receive a fair trial. *Thompson,* 248 F.3d at 627 (quoting *United States v. Garcia,* 936 F.2d 648, 653 (2d Cir.1991)). The determinations of the

state courts that she was impartial were manifestly unreasonable.

### iii. Tonn

Tonn testified on voir dire that his opinion was that petitioner was guilty. The court questioned him first and asked if he could set his opinion aside, and Tonn said: "I honestly don't know." (App. at 905.) The court asked him whether he could set aside his opinion even if the evidence showed that the information on which it was based was inaccurate. Tonn said "ah, again, I don't know if I—if I could make that separation." (*Id.* at 906.)

The prosecutor then asked Tonn whether he could follow the court's instructions and decide the case on the evidence. Tonn said: "I don't think so." (*Id.* at 907.) The prosecutor asked Tonn why this was so, and Tonn mentioned that it was primarily the videotape that he had seen. The prosecutor then asked Tonn if he could decide the case based on the evidence if the videotape were part of the evidence, and Tonn said "yeah." (*Id.* at 908.)

Petitioner's counsel then questioned Tonn and they engaged in the following colloquy:

Q. And when you responded to Mr. Bucher that you would not be able to set aside your opinion, were you referring only to opinions based on what you saw on television or opinions that were the result of the print media as well?

A. Both.

Q. So even if the videotape was introduced as evidence in this case and you viewed it as a juror are you saying that you would have—you would not be able to set aside opinions that you've reached about this case from other media sources such [as] the press?

A. I would say no.

Q. No? You would not be able to set those aside?

A. No.

(*Id.* at 909.)

Petitioner's counsel then asked Tonn about his previous request to discuss something outside the presence of the other jurors, and Tonn said that serving on the jury "would be a hardship for the business that I run." (*Id.* at 910.) Petitioner's counsel asked whether that problem would affect Tonn's ability to be impartial. Tonn replied: "It would cause great distress on a regular basis. I don't know how I would—if that would affect the impartiality or not." (*Id.*)

The court then advised Tonn that if he were a juror he would be able to have some contact with his business and asked him if that would relieve some of his concerns, and Tonn said, "that would relieve some." (*Id.* at 911.) However, the court did not ask him if that would enable him to be an impartial juror.

The prosecutor then questioned Tonn again as follows:

Mr. Bucher: Yes. Just one question.

Q. It's catching. Umm, if—so I understand that if you're instructed by the court that as you come into the jury room you aren't to wipe out your memory banks and forget what you heard but set aside any preconceived opinions that you have regarding guilt or innocence and decide the case only on the evidence and not what you read, and if part of the evidence is the video you'd be able to do that? That's what I thought I—

A. Yeah.

Q. —heard you say.

(*Id.* at 912.)

After Tonn's voir dire, petitioner asked that he be removed for cause. The court

noted that Tonn had given "divergen[t] or inconsistent answers," but denied petitioner's request in part because petitioner's counsel permitted the prosecutor to ask the last question. (*Id.* at 917.) Petitioner's counsel objected to the court relying on such a ground stating that he had chosen not to ask more questions because he thought that it was "important not to badger these people," and "it was clear that [Tonn] was giving inconsistent answers." (*Id.* at 918.) *See State v. Ferron,* 219 Wis.2d 481, 503, 579 N.W.2d 654 (1998) (cautioning courts that jurors being questioned on voir dire should not be badgered), *overruled on other grounds by Lindell,* 245 Wis.2d 689, 629 N.W.2d 223.

With respect to the reasonableness of the state courts' determination that Tonn was impartial, although Tonn said a number of times either that he could not set his opinion aside, that he did not think he could set it aside or that he did not know if he could set it aside, he did answer "yeah" to the prosecutor's question at the end of voir dire. And the trial court deemed his answer to be credible. Therefore, whatever reservations I might have about that aspect of the state courts' determination, such reservations would probably be an insufficient basis for overturning the determination.

However, Tonn's voir dire suffers from a more serious deficiency. Tonn testified that he did not know if his distress about being away from his business would affect his ability to be impartial. After he said this, the court attempted to allay his concerns by telling him that he could have some contact with his business. The court then asked him if that would relieve some of his concerns, and Tonn said: "If I was able to have contact on a regular basis that would relieve some." (App. at 911.) However, the court never asked him if that would enable him to be impartial and never obtained any assurance from him that,

notwithstanding his previous "I don't know," he would be able to be impartial.

In this respect, the case is similar to *Thompson.* The critical question, whether Tonn could be impartial despite his concerns about his business, was left dangling. In *Thompson,* the court said: "Had the judge pushed Leiter [the juror in question] and had she finally given unequivocal assurances that he deemed credible, his ruling could not be disturbed. But he failed to do that." 248 F.3d at 627. The same problem exists with Tonn. The court did not obtain the unequivocal assurance of impartiality that the law requires. Again, the issue is not one of credibility. Rather, the record does not reflect those "unwavering affirmations of impartiality" that permitted the court in *Garcia,* 936 F.2d at 653, to find the challenged juror impartial. *See Thompson,* 248 F.3d at 627. Thus, the state courts' determinations that Tonn was impartial were unreasonable.

**b. Deprivation of Peremptory Strikes**

Under Wis. Stat. § 972.03, petitioner was granted seven peremptories. He used three of them to remove Goldberg, Weidler and Tonn.

**c. Deprivation of Right to a New Trial**

 Under *Lindell,* the question of whether a defendant obtains a new trial when he has used peremptory strikes to correct trial court failures to remove biased jurors depends on whether the loss of peremptories affects the defendant's substantial rights. 245 Wis.2d at 746–47, 629 N.W.2d 223 (citing Wis. Stat. § 805.18(2)). In *Lindell,* the state supreme court offered little guidance on when the loss of peremptories because of trial court errors might affect a defendant's substantial rights except to say that the loss of one peremptory would not affect such rights, and the loss

of most or all peremptories might affect them. *Id.* However, in the present case, there can be little doubt that the loss of three peremptory strikes affected petitioner's substantial rights.

As the record indicates, petitioner found it extremely difficult to find jurors who were not predisposed against him. More than eighty percent of the respondents to juror questionnaires said that he was guilty, and many added hostile comments. Under these circumstances, peremptory strikes were particularly precious.

The harm caused by the loss of three strikes was amplified by the trial court's failure to inquire into the improper communications in the jury assembly room. Because the trial court did not attempt to discover which jurors had made the improper statements and whether other jurors had been influenced by them, petitioner knew that some of the jurors in the pool from which his peremptories were exercised were biased against him but he did not know which ones. The loss of peremptories made it less likely that he would be able to eliminate them.

Finally, the loss of peremptories affected petitioner's substantial rights because it prevented him from removing juror Schuenke. When petitioner discovered that Schuenke had written to the court threatening not to decide the case on the merits, he asked the court to remove Schuenke for cause or to question him about whether he could perform his duties as a juror. When the court denied both requests, petitioner faced a dilemma with respect to the exercise of his peremptory strikes. Petitioner made a record on the issue advising the court that he had planned to use his seven peremptories to strike jurors who he had unsuccessfully challenged for cause (including Goldberg, Weidler and Tonn), but that he was now faced with a juror who had threatened to "vote either way just to end it," and he had

no peremptories available to remove him. (App. at 322–23.)

Thus, the trial court's errors with respect to Goldberg, Weidler and Tonn prevented petitioner from exercising a peremptory strike to remove Schuenke. Whether Schuenke was an irresponsible juror, as indicated by his letter, or a biased one, as indicated by his statements in the jury assembly room, petitioner had cause to remove him. Both *Ross* and *Martinez–Salazar* make clear that when a defendant's loss of peremptories due to trial court failures to remove biased jurors causes a biased juror to sit on the jury, due process and the right to an impartial jury are denied. *Martinez–Salazar*, 528 U.S. at 316, 120 S.Ct. 774 ("Nor did the [trial court's error] result in the seating of any juror who should have been dismissed for cause. As we have recognized, that circumstance would require reversal.") (citing *Ross*, 487 U.S. at 85, 108 S.Ct. 2273).

### 3. Conclusion

Thus, petitioner was deprived of important rights conferred on him by state law with respect to jury selection. He was deprived of the right to have the court remove biased jurors and, as a result, was deprived of three peremptory strikes. Moreover, the loss of the three peremptory strikes affected his substantial rights and, therefore, entitled him to a new trial. However, based on its unreasonable finding that Goldberg, Weidler and Tonn would have been impartial jurors, the state court of appeals deprived him of this right also. Thus, he did not receive "all that was due [him] under [state] law." *Ross*, 487 U.S. at 91, 108 S.Ct. 2273. Therefore, he was denied due process.

Further, because the trial court's errors also resulted in at least one biased juror being seated, such errors also denied peti-

tioner an impartial jury. For both these reasons, the writ must issue pursuant to 28 U.S.C. § 2254(d)(2).

### IV. CONCLUSION

The harmless error doctrine does not bar issuance of the writ. Denial of the right to an unbiased tribunal is one of those trial errors that is not excused by being shown to be harmless. *Thompson*, 248 F.3d at 622 (citing *Gray v. Mississippi*, 481 U.S. 648, 668, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987)). Finally, because I have determined that the writ must be granted for the reasons stated above, I do not address petitioner's claim of ineffective assistance.

Therefore,

**IT IS ORDERED** that the petition for the writ of habeas corpus is **GRANTED.**

In order to afford the state the opportunity to retry petitioner, **IT IS FURTHER ORDERED** that the execution of this order is **STAYED** for 180 days.